**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

JARED LYNN HOLLAND, an individual; and
NICHOLAS IANNOTTI, an individual,

      Plaintiffs,

                                        Case No.:

v.

PRICEMDS.COM INC., a Florida for-profit
corporation; MARC GROSSMAN, MD, an
individual; and DANTE PANELLA, an individual,

      Defendants.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, JARED LYNN HOLLAND ("Holland") and NICHOLAS IANNOTTI ("Iannotti"), (together, the "Plaintiffs"), file this Complaint and Demand For Jury Trial against Defendants, PRICEMDS.COM INC. ("PriceMDs"), MARC GROSSMAN, MD ("Grossman"), and DANTE PANELLA ("Panella") (collectively, the "Defendants"), and allege as follows:

## INTRODUCTION

Since its inception in 2013, Grossman has operated PriceMDs as his own personal fiefdom, maintaining secrecy over the day-to-day operations of the company and refusing to advise the shareholders of the actions or financial condition of the company. From 2015 through the present date, Grossman and PriceMDs have categorically refused to provide Plaintiffs with annual financial statements or an accounting of monies paid to shareholders, including themselves, pursuant to various stock purchase agreements, have breached these

same stock purchase agreements and other contractual obligations in multiple and obvious ways, and have been unjustly enriched as a result of their misconduct.   The remaining Defendants' active and wrongful participation in a conspiracy designed to deprive Iannotti of his shares of stock contributed to the losses suffered by the Plaintiffs.   In short, the Plaintiffs seek an award of damages against Defendants for their various contractual breaches and other wrongful conduct as specifically set forth herein.

## JURISDICTION AND VENUE

1.      This is an action for damages that exceed $75,000.00, exclusive of attorneys' fees and costs.

2.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 and 28 U.S.C. § 1367.

3.      Holland is an individual who resides and is domiciled in Austin, Texas.

4.      Iannotti is an individual who resides and is domiciled in Chicago, Illinois.

5.      PriceMDs is a Florida for-profit corporation with its principal place of business located at 720 Brooker Creek Blvd, #221, Oldsmar, Florida 34677.

6.      Grossman is an individual who, upon information and belief, resides and is domiciled in Exeter, New Hampshire.   According to PriceMDs' website, Grossman is the company's Chairman, Co-Founder, and Chief Executive Officer.

7.      Panella is an individual who, upon information and belief, resides and is domiciled in Tampa, Florida.   According to PriceMDs' website, Panella is the company's Head of Business Development; however, Panella's current LinkedIn profile states that he is President and Co-Founder of PriceMDs.

8.     This Court has personal jurisdiction over the Defendants because they either reside in this State, committed tortious acts resulting in injury in this State, or have purposefully availed themselves of the benefit of doing business in this State.

9.     Venue is proper in the Middle District of Florida under 28 U.S.C. § 1391(b)(1) as this is the judicial district which at least one defendant resides, and under 28 U.S.C. § 1391(b)(2) as this is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

10.     While Grossman was represented as the CEO of PriceMDs, it is readily apparent that Panella actually led the company, and participated or orchestrated most, if not all, aspects of PriceMDs' operations, including (a) hiring of employees, staff, and management; (b) investor communications; (c) scripting of marketing material; (d) sales presentations; (e) drafting press releases; (f) drafting revenue projections and company outlooks; (g) handling investor inquiries; and (h) directed the purchase of equipment, marketing materials, and directed programing changes.

11.     All conditions precedent to maintaining this action have been met or otherwise waived.

12.     Plaintiffs have retained the undersigned attorneys and are responsible for the reasonable fees associated with the legal services rendered in this action.

## FACTUAL ALLEGATIONS

**A.      Plaintiffs' Investments in PriceMDs.**

13.      PriceMDs' website bills the company as "a healthcare insurance technology company that offers Surgery, Treatment & Worker's Comp. benefit management solutions for self-insured insurance plans and their beneficiaries."

14.      Plaintiffs are shareholders of PriceMDs who provided investment capital exceeding $150,000.00—and in Iannotti's case, raised in excess of $250,000.00 from outside investors—as part of a $1,000,000.00 "Friends & Family Best Efforts" capital raise conducted by PriceMDs in 2015 and 2016.

*(i)      Holland's Investment in, and Receipt of Payments from, PriceMDs*

15.      Holland is an outsider to PriceMDs.  He was brought in as an investor during the Friends & Family round by PriceMDs' then-Director of Finance, Chris Eikenberry.

16.      Holland made two separate investments during the Friends & Family round.

17.      On or about August 10, 2015, Holland entered into a Stock Purchase Agreement with PriceMDs under which he purchased 17,500 shares of company common stock at a price of $2.00 per share, for an initial investment of $35,000.00.  A true and correct copy of Holland's first Stock Purchase Agreement is attached hereto as **Exhibit A** (the "Holland SPA_1").

18.      On or around January 8, 2016, Holland entered into a second Stock Purchase Agreement with PriceMDs pursuant to which he purchased an additional 50,000 shares of company common stock at the same price of $2.00 per share, for a second investment of $100,000.00.  A true and correct copy of Holland's second Stock Purchase Agreement is

attached hereto as **Exhibit B** (the "Holland SPA_2", and together with the Holland SPA_1, the "Holland SPAs").

19.     PriceMDs issued stock certificates to Holland for both of his purchases pursuant to the terms of the Holland SPAs.

20.     Accordingly, Holland's total investment in PriceMDs was $135,000.00, and Holland currently holds 67,500 shares of company common stock.

21.     Both the Holland SPA_1 and Holland_SPA2 contain provisions for repayment of dollars invested.

22.     The Holland SPA_1 provides, in relevant part:

Jared Lynn Holland will be paid quarterly pro rata from 40% of collected revenue* until amount paid in stock purchase of PriceMDs.com of 17,500 shares dated 8/10/15 is paid in full to Investor.  *Revenue is monies paid solely and exclusively from sales of 'Click Throughs' on website PriceMDs.com.

*See* Exhibit A, Ex. A.

23.     Whereas, the Holland SPA_2 states:

Jared Lynn Holland will be paid quarterly pro rata from 40% of collected revenue* until amount paid in stock purchase of PriceMDs.com of 50,000 shares dated 1/8/16 is paid in full to Investor.  *Revenue is monies paid exclusively from sales of products and services as well as strategic partnerships of PriceMDs.com.

*See* Exhibit B, Ex. A.

24.     Both agreements provide that: "Investor retains all shares purchased with this Agreement."  *See* Exhibit A, § 1.5; *see* Exhibit B, § 1.5.

5

25.     In the nearly three (3) years that followed his initial investment, Holland did not receive a single dollar of capital repayment under either of the Holland SPAs.  Moreover, Holland was not provided any accounting of the revenues collected and/or repaid to investors.

26.     Holland has never been provided an accounting or any type of explanation from PriceMDs of the revenues it has collected and/or repaid to investors, including himself.

27.     In May 2018, without any accounting or explanation, PriceMDs made an initial return of capital payment to Holland in the amount of $3,199.49.

28.     Since then, he has received additional return of capital payments from PriceMDs, as follows:

$  3,199.49 –     05/2018
$  3,274.49 –     09/2018
$  8,401.48 – 10/16/2018
$12,290.10 – 01/18/2019
$10,547.33 – 04/16/2019
$11,602.06 – 07/10/2019
$13,333.33 – 10/01/2019
$13,953.49 –     01/2020
$10,000.00 – 04/07/2020
$13,398.23 – 06/26/2020

29.     In the email communication advising Holland of the June 2020 payment, PriceMDs Comptroller/SVP of Analytics, Max Grossman, stated the following:

> Please be advised that you will receive a check that will be sent to you by 6/26/20 representing the final payout for your investment from 2020 Q2 revenue. The check that you will receive for Q2 2020 is in the amount of $13,398.23. Please note that this payment, taken together with prior payments you have already received will constitute 100% payment in full for the entire balance owed to you under the terms of your $100,000 Friends & Family Stock Purchase. You have now received the entire $100,000 amount of your Friends & Family investment. Of course, any distributions due all shareholders such as the recent $0.02 dividend you received for 2020 Q1 will continue to be paid out in due course accordingly.

30.     Accordingly, it is PriceMDs stated position that it has fulfilled its repayment obligations to Holland under the Holland SPAs.

31.     However, to date, Holland has not received a single penny capital repayment from PriceMDs under the Holland SPA_1.

32.     Since making his $135,000 Friends & Family investment in PriceMDs, Holland has received, without notice or explanation, certain dividend payments from the company, to wit:

> $0.01 per share dividend payment in January 2020 in the amount of $675.00
> $0.02 per share dividend payment in April 2020 in the amount of $1,350.00
> $0.021 per share dividend payment in July 2020 in the amount of $1,417.50
> $0.025 per share dividend payment in September 2020 in the amount of $1,687.50

33.     These dividends resulted in nominal payments to Holland, however, upon information and belief, produced significant payments to the company's top shareholders, including Grossman and Panella.

34.     Holland has never been provided any information as to how the return of capital payments he has received have been calculated and whether they actually corresponded to PriceMDs contractual obligation to pay him "quarterly pro rata from 40% of collected revenue" under both of the Holland SPAs.  *See* Exhibits A and B.

35.     Additionally, Holland has never been provided an explanation of why it took nearly three (3) years to receive his first return of capital payment.

36.     On information and belief, the delay was at least partly due to PriceMDs' position that Holland is not entitled to any return of capital under the Holland SPA_1 due a

change in the company's revenue model that was unilaterally implemented by its leadership after Holland signed the agreement.

37.     On information and belief, PriceMDs has selectively paid return of capital payments to specific investors at its own discretion, rather than first paying Holland "quarterly pro rata from 40% of collected revenue" as the Holland SPAs require.

38.     On information and belief, certain shareholders have had their entire capital investments "repurchased" by PriceMDs at the same or higher amounts than the original purchase prices, again, rather than first paying Holland "quarterly pro rata from 40% of collected revenue" as the Holland SPAs require.

39.     Furthermore, PriceMDs is paying significant dividends to its largest shareholders prior to fulfilling its return of capital obligation to Holland.

### (ii)     *Iannotti's Investment in PriceMDs*

40.     Iannotti is the Chief Executive Officer of an interactive technology, marketing, and digital media company called Belmont Digital, LLC ("Belmont").

41.     In the early stages of PriceMDs' inception, Belmont was contracted to build PriceMDs' website and provide hosting services for the company's servers.

42.     As the owner of Belmont, Iannotti was the main point of contact for these services.

43.     In or around July 2014, Iannotti was asked by Grossman to become PriceMDs' Chief Technology Officer (CTO) and to join the company's Board of Directors.

44.     Subsequent thereto, PriceMDs initiated its Friends & Family capital raise in which directors, officers, and other upper-level personnel were encouraged to secure investment dollars from, as the name suggests, their networks of friends and family.

45.     Personal investments were also encouraged, and Iannotti committed to making a $25,000 investment in PriceMDs for that round.

46.     Iannotti also raised over $250,000 from his personal network during the Friends & Family round.

47.     On September 1, 2015, as Iannotti was working to help establish and open PriceMDs' new office in Oldsmar, Florida, he entered into the Stock Purchase Agreement with PriceMDs for the purchase of 12,500 shares of PriceMDs common stock valued at $25,000.  A true and correct copy of Iannotti's Stock Purchase Agreement is attached hereto as **Exhibit C** (the "Iannotti SPA").

48.     In discussions over the weeks that followed, Iannotti and Grossman agreed to modify the terms of the Iannotti SPA so that, in lieu of my making any cash payment for the stock, Iannotti would instead purchase supplies, equipment and services for PriceMDs' new office, and Belmont would provide discounted programming services to PriceMDs, the value of which would be applied to satisfy Iannotti's payment obligation under the Iannotti SPA.

49.     Grossman confirmed his agreement to this arrangement in an email dated November 18, 2015, a true and correct copy of which is attached hereto as **Exhibit D.**

50.     Based upon this agreement, Iannotti continued to provide the agreed upon services and to purchase equipment to outfit PriceMDs' new corporate office, and Belmont

continued to provide the agreed upon programming services, a portion of which satisfied Iannotti's obligations under the parties' stock purchase agreement.

51.     Iannotti did not know that at the time that Grossman, acting on behalf of PriceMDs, had no intent to deliver the stock certificates to Iannotti as promised; instead, Grossman and PriceMDs only entered this agreement with Iannotti to obtain the benefit of Iannotti and Belmont's services and the equipment without providing anything in return.

52.     Upon information and belief, Panella was aware of Grossman's plan to defraud Iannotti and, in fact, assisted him in doing so, as is set forth herein.

53.     In February 2016, Panella sent a message to Iannotti indicating that Grossman agreed to give Iannotti a seat on the PriceMDs' Board of Directors.  *See* **Exhibit E**.

54.     That same month, Panella told Iannotti, "I'm going on the offensive starting tomorrow, I'm calling in favors, I will close 5mil in 30 days, I want you to be CEO IN 90 days, we need to do this, need marc out of the way."  *See* **Exhibit F**.  Panella then tells Iannotti, "Let's plan on meeting with Ahab in next week, he made 5m last qtr. And has priv. by her balls."  *Id*.

55.     Again, in February 2016, Panella also messaged Iannotti, "You have my 100% commitment, I want you to be CEO of PriceMDs.com, you're part of the couch friendship, let me know what you want in contract, save this text."  *See* **Exhibit G**.

56.     In March 2016, Panella told Iannotti, "Fyi, jp just told me Marc told JP he sees you as the future ceo of the company."  *See* **Exhibit H**.

57.     In April 2016, Panella again informed Iannotti, "Trust me things are going as planned, don't sweat the little things, you will be ceo, Marc will chill out shortly Have a good

night."  *See* **Exhibit I**.  Then Panella informed Iannotti, "All good, we will do this together, you will Be ceo I can't do it without you."  *Id.*

58.     In May 2016, Panella emailed Iannotti informing Iannotti that he was issued 25,000 stock options by PriceMDs for having brought in outside investment capital during the PriceMDs initial raise.

59.     In the Iannotti SPA, the parties agreed as follows: "Nicholas Iannotti will be paid quarterly pro rata from 40% of collected revenue* until amount paid in stock purchase of PriceMDs.com of 50,000 shares dated 9/1/15 is paid in full to Investor.  *Revenue is monies paid exclusively from sales of products and services as well as strategic partnerships of PriceMDs.com."  *See* Exhibit C, at Exhibit A.  "Investor retains all shares purchased with this Agreement."  *Id.* at § 1.5.

60.     While Iannotti was employed by PriceMDs as its CTO, Belmont continued to provide programming services to PriceMDs, which Iannotti was responsible for overseeing.

61.     Belmont continued to invoice PriceMDs directly on an "hours-worked" basis for the services the company provided to PriceMDs.

62.     Iannotti informed Grossman and Panella that he paid the programmers through PayPal/Credit Card, and yet they demanded copies of checks.  Accordingly, Iannotti provided copies of check fronts, representing the amounts he had paid to the programmers on behalf of PriceMDs.  Thereafter, Iannotti and Panella exchanged messages wherein Panella asked whether Iannotti could resubmit the invoices as being paid with a credit card.  *See* **Exhibit J**.  Iannotti remained confused, and asked why (a month later), this was an issue now.  *Id.*

63.     Nonetheless, Iannotti submitted to company co-founder and President Panella all invoices to account for Iannotti's full investment amount.  *See* e-mail from Iannotti to Panella dated June 16, 2016, attached hereto as **Exhibit K.**

64.     Additionally, later that same month in June 2016, Iannotti texted Panella about the stock certificates, and stated, "I sent you the updated email like you requested showing payments made to the programmers via CC instead of the checks now for my F&F (Friends and Family).  Marc told me the minute I do that he'll get me the stock certs."  *See* **Exhibit L.** In response, Panella told Iannotti "let me go first," in corresponding with Grossman, and "he will get you your certs by the end of week...."  *Id*.

65.     Panella later, in the same message, after Iannotti indicated he would like to speak with Grossman directly, he was informed by Panella, "No, don't waste the time right now, it wont play well with marc, he will get you the certs."  *Id*.

66.     On July 26, 2016, in response to Iannotti's continued efforts to obtain payment on the Belmont Invoice so that he could, in turn, pay Belmont's international programmers who had performed the work, Panella sent Iannotti an e-mail in which he confirmed that PriceMDs did not dispute the invoice amount, but that additional documentation was being requested by the company's accountants due to supposed oversight issues.

67.     The message from Panella to Iannotti stated as follows:

Nick,

Good Morning.  I hope you had a nice drive down from Chicago.  Hopefully the following information can be completed quickly as the amounts aren't in question, just the documentation. **(I know this is a pain in the ass, but it truly is needed)**

PriceMDs is now under additional oversight because of our 506c filing and

the SEC audits that will have to be completed following the filing of this Series A raise.  All members of the team especially officers and directors have a higher fiduciary responsibility to compliance on all aspects of the business.

The accountant is requesting additional information from you on a few of your invoices submitted.  In the future we will have to follow this protocol and the prior invoices will have to be updated to this standard before SEC filing or Audit.

(Cut and paste from Accountant:)

1. Flagged invoices can be potential COI (conflict of Interest) as they are run thru his LLC Belmont Digital-- really need them to be 1099 or direct- to employee
2. No last name on invoices of programmers
3. June 325 hours of programming with need accountability of task accomplished and backlog-of details
4.Need evidence that programmers were actually paid-- verify accounts

Call me to discuss if you have any questions.

Dante Michael Panella

727-204-4627
www.PriceMDs.com
Head of Business Development
DantePanella@PriceMDs.com



*See* e-mail from Panella dated July 26, 2016, attached hereto as **Exhibit M** (emphasis in original)**.**

68.    In August 2016, Panella told Iannotti in response to Iannotti asking whether he could get him his stock certificates, "Yes, already on it, don't worry."  *See* **Exhibit N.**

69.    In addition to receiving programming services at a discounted price, PriceMDs received the additional benefit of not having any cash outlay for those services, or for the

equipment purchased by Iannotti and Belmont, which allowed PriceMDs to preserve capital while its website was still in development.

70.     As set forth herein, and as the exhibits attached hereto demonstrate, Iannotti, on repeated occasions, demanded that PriceMDs issue the stock certificates reflecting his 12,500 shares paid for through the provision of services and the purchase of office equipment as agreed upon between Grossman, on behalf of PriceMDs, and Iannotti, following execution of the Iannotti SPA.

71.     Iannotti was thereafter forced to deal only with Panella on these issues in what can only be perceived as an attempt by Grossman to insulate himself from the fraud he perpetrated upon Iannotti, and of Panella's knowing assistance therewith.

72.     Time and time again, Iannotti was promised by Panella that the certificates would be forthcoming.

73.     In August 2016, Iannotti was informed by Panella that Grossman already agreed to giving Iannotti increased responsibility on the Board of Directors and more compensation for his efforts.  *See* **Exhibit O**.

74.     That same month, Iannotti, concerned that his compensation had not increased and given his workload, texted Panella regarding these issues.  Iannotti stated in his text messages that he was continually promised an increase in compensation and salary, and that Panella had routinely told him "PriceMDs can't succeed without my involvement."  *See* **Exhibit P**.  In response, Panella informed Iannotti that he would call him in an hour, and, that "this doesn't work without you."  *Id.*

14

75.     Again, in August 2016, Iannotti told Panella, "I've also asked him for my stock certificates about 5 times now.  I've had my paperwork in to him since April.  He keeps telling me it's just waiting for a signature from Ahab."  *See* **Exhibit Q**.  In response, Panella stated, "I'll get Ahab t [sic] sign don't worry."  *Id*.

76.     In September 2016, Panella told Iannotti that based on PriceMDs' successes, "You and your investors …pretty much guaranteed to get investments back and free stock."  *See* **Exhibit R**.  This representation and acknowledgement regarding Iannotti's investment in PriceMDs and Panella's promise for free stock and investments, were relied upon by Iannotti in continuing to work for PriceMDs.

77.     The stock certificates were never issued, as the Defendants obviously never had any intention of fulfilling their obligations Iannotti regarding his position as a shareholder of PriceMDs.

78.     On February 23, 2017, sensing that he had been scammed into pouring endless efforts into a startup company based on empty promises, Iannotti submitted written notice to Grossman that he was resigning as CTO and from his position on the Board of Directors of PriceMDs.  *See* True and correct copy of Iannotti's Resignation and Demand for Unpaid Wages/Invoice, attached hereto as **Exhibit S.**  This letter also reflected Iannotti's intent to retain the 12,500 shares stock he had purchased in the PriceMDs' Friends & Family stock round.

79.     Grossman acknowledged receipt of Iannotti's demand without challenging Iannotti's stock ownership in the course of multiple email exchanges between the two of them.

15

**B.**     **Defendants' Fraudulent Conduct, and PriceMDs' Breaches of its Agreements with Holland and Iannotti.**

80.     The investments made by Holland and Iannotti, like so many others who participated in the PriceMDs' Friends & Family round, were procured through a campaign of misrepresentation that started at the very top of PriceMDs with its co-founders, Grossman and Panella.

81.     Key employees, such as Iannotti, were barraged with communications encouraging them to invest in PriceMDs, and to have their friends and family members invest, based on representations of actual progress within the company which, in reality, had not occurred.

82.     New contract partners were touted regularly without any evidence of signed contracts or actual business dealings.  Investors were repeatedly told of the growing database of TPAs and physicians who had registered to use PriceMDs, though in reality, the database contents were simply scrubbed from the internet without the providers' knowledge or any agreement to work with PriceMDs.

83.     Simply put, PriceMDs' leadership was selling a concept as though it was already a reality, causing investors like Holland and Iannotti to make investments they otherwise would not have made had true and accurate representations of the company's status been known or disclosed.

84.     Iannotti was additionally induced to enter into the Iannotti SPA based on the promise that he would be issued 12,500 shares of PriceMDs common stock for the purchase price of $25,000.

85.     Once the parties had entered into the Iannotti SPA, Iannotti and Grossman orally modified same to allow Iannotti to provide discounted programming and design services, and purchased office equipment for the PriceMDs office, valued at $25,000, rather than pay cash for the stock.

86.     Iannotti acted in reliance on his agreement with Grossman, acting on behalf of PriceMDs, and provided the agreed upon services and equipment, but PriceMDs refused to issue the promised stock certificates.  It became apparent to Iannotti that PriceMDs never had any intention of issuing the stock certificates.  As a result of its fraudulent conduct, PriceMDs has been unjustly enriched in that it accepted the benefits of the work provided by Belmont and Iannotti, and the equipment purchases from Iannotti, without ever issuing the promised shares.

87.     PriceMDs also committed multiple and ongoing breaches of its stock purchase agreements with Holland and Iannotti.  Both Holland and Iannotti were induced to enter into their respective stock purchase agreements based on the promise that they would be paid "quarterly pro rata from 40% of collected revenue" until their original stock purchase amount was repaid in full, *see* Nos. 3, 9, and 10, Exhibit A, a promise it has become clear the company never intended to keep.

88.     On December 17, 2015, Grossman sent an e-mail to all PriceMDs shareholders advising that the company would be making its "first 'return of *capital* payment' on April 15, 2016."  *See* e-mail from Grossman dated December 17, 2015, attached hereto as **Exhibit T.** Neither Holland nor Iannotti received a payment in April 2016.  In fact, as detailed above,

Holland did not receive a return of capital payment until May 2018, more than two years after the promised date; and Iannotti has not received a single return of capital payment to date.

89.     PriceMDs failure to timely pay and account for its payments (or lack thereof) is a direct breach of the company's contractual obligation to Holland and Iannotti to repay their capital investments "quarterly pro rata from 40% of collected revenue" until repaid in full. *See* Nos. 3, 9, and 10, Exhibit A.

90.     Furthermore, with respect to Iannotti specifically, PriceMDs has breached the Iannotti SPA by failing to include him in dividend payments made to all shareholders, and by failing to issue promised stock certificates despite repeated assurances by Panella, made on behalf of PriceMDs, that same would be issued.

91.     Belmont continued to provide programming services, which were to be paid for despite the accrual of Iannotti's salary.

**C.     Conclusion.**

92.     In reliance on the misrepresentations by PriceMDs' leadership and promises of timely repayment of capital, Holland and Iannotti invested $135,000 and $25,000, respectively, in PriceMDs.

93.     While Holland has received certain return of capital payments, they have been sporadic and wholly inconsistent with amounts received by other investors.

94.     Iannotti, on the other hand, has yet to have a single dollar of his investment returned, nor was he included in the four (known) dividend payments made to shareholders to date.

95.     In a letter sent to all PriceMDs shareholders on or about February 20, 2019, Grossman proudly announced that "PriceMDs' last raise in common stock was completed at $3.50 per share, which is equivalent to a $51 MM post-money valuation on a fully diluted basis."  *See* Shareholder Letter Feb 2019, attached hereto as **Exhibit U**.  Grossman further projected revenues for 2019 of "between $14 - $20+ million." *Id.*

96.     To that end, PriceMDs has issued four (known) dividend payments to shareholders, in spite of the fact that not all shareholders have had their capital repaid in full, including Holland and Iannotti.  These dividends, in even the smallest amounts, greatly inure to the personal benefit of Grossman and Panella as majority shareholders, while providing only a nominal benefit to the rest of the minority shareholders.

97.     On January 4, 2016, in order to placate investors and lure prospective investors, Defendant PriceMDs, through Panella, released false 2016 financial statements projecting sales for such physical year to total $15,000,000.00 in revenue.  Such statements were knowingly false in that such revenue stream did not exist, which was evidenced by the fact that PriceMDs did not have executed contacts with health care providers such as HealthExpense, TriNet, GodRx, and Healthsmart.

98.     At the time when such statements were made, these companies did not have their customer/patients enrolled with PriceMDs.  Such false declarations of financial profitability generated from existing contracts was reiterated by Panella on December 7, 2016.

## COUNT I
### Breach of Contract – Holland SPA_1
### (Holland v. PriceMDs)

99.     Holland incorporates and re-alleges paragraphs 1 through 98 as if fully set forth herein.

100.    Holland entered into a written contract with PriceMDs, the Holland SPA_1, on or around August 10, 2015.

101.    The Holland SPA_1 obligated Holland to invest $35,000.00 in exchange for 17,500 shares of PriceMDs company common stock at a price of $2.00 per share.

102.    Holland paid PriceMDs the $35,000.00 and Price MDs thereafter issued stock certificates to Holland.

103.    Pursuant to the Holland SPA_1, Holland was to receive:

Jared Lynn Holland will be paid quarterly pro rata from 40% of collected revenue* until amount paid in stock purchase of PriceMDs.com of 17,500 shares dated 8/10/15 is paid in full to Investor.  *Revenue is monies paid solely and exclusively from sales of 'Click Throughs' on website PriceMDs.com.

*See* Exhibit A.

104.    Further, the Holland SPA_1 provides that:   "Investor retains all shares purchased with this Agreement."  *See* Exhibit A, § 1.5.

105.    Holland has not received a single dollar of capital repayment under the Holland SPA_1.

106.    Moreover, Holland was not provided any accounting of the revenues collected and/or repaid to investors.

107.    On information and belief, PriceMDs' has taken the position that Holland is not entitled to any return of capital under the Holland SPA_1 due a change in the company's

revenue model that was unilaterally implemented by its leadership after he signed the agreement.

108.    On information and belief, PriceMDs has been selectively paying return of capital payments to specific investors at its own discretion, rather than first paying Holland "quarterly pro rata from 40% of collected revenue" as the Holland SPAs require.

109.    Certain shareholders have had their entire capital investments "repurchased" by PriceMDs at the same or higher amounts than the original purchase prices, again, rather than first paying Holland "quarterly pro rata from 40% of collected revenue" as the Holland SPA_1 requires.

110.    These actions by PriceMDs constitute a breach of the Holland SPA_1 that PriceMDs entered into with Holland.

111.    PriceMDs failure to timely pay and account for its payments (or lack thereof) is a direct breach of the company's contractual obligation to Holland to repay their capital investments "quarterly pro rata from 40% of collected revenue" until repaid in full.

112.    As a direct and proximate result of PriceMDs' breach of contract, Holland has been damaged.

113.    The Holland SPA_1 contains an attorney's fee provision relating to enforcement of the agreement.

WHEREFORE, Holland demands judgment against PriceMDs for damages, attorneys' fees, as set forth in the Holland SPA_1, court costs, and any such other and further relief as this Court deems just and appropriate.

## COUNT II
### Breach of Contract – Iannotti SPA
### (Iannotti v. PriceMDs)

114.    Iannotti incorporates and re-alleges paragraphs 1 through 98 as if fully set forth herein.

115.    Iannotti entered into a written contract with PriceMDs, the Iannotti SPA, on or around September 1, 2015.  *See* Exhibit C.

116.    The Iannotti SPA obligated Holland to invest $25,000.00 in exchange for 12,500 shares of PriceMDs company common stock at a price of $2.00 per share.  *See id.*

117.    In discussions over the weeks that followed, Iannotti and Grossman agreed to modify the terms of the Iannotti SPA so that, in lieu of my making any cash payment for the stock, Iannotti would instead purchase supplies, equipment and services for PriceMDs' new office, and Belmont would provide discounted programming services to PriceMDs, the value of which would be applied to satisfy Iannotti's payment obligation under the Iannotti SPA.

118.    Grossman confirmed his agreement to this arrangement in an email dated November 18, 2015.

119.    Iannotti was also issued 25,000 stock options by PriceMDs for having brought in outside investment capital during the PriceMDs initial raise, as confirmed by both Dante and Grossman on May 11, 2016.

120.    In the Iannotti SPA, the parties agreed as follows: "Nicholas Iannotti will be paid quarterly pro rata from 40% of collected revenue* until amount paid in stock purchase of PriceMDs.com of 50,000 shares dated 9/1/15 is paid in full to Investor.  *Revenue is monies

paid exclusively from sales of products and services as well as strategic partnerships of PriceMDs.com." "Investor retains all shares purchased with this Agreement."

121.   On repeated occasions, Iannotti demanded that PriceMDs issue the stock certificates reflecting his 12,500 shares paid for through the provision of services and the purchase of office equipment as agreed upon between Grossman, on behalf of PriceMDs, and Iannotti.

122.   Iannotti was thereafter forced to deal only with Panella on these issues; and time and time again, Iannotti was promised by Panella that the certificates would be forthcoming.

123.   The stock certificates were never issued, as the Defendants obviously never had any intention of allowing Iannotti to become a shareholder of PriceMDs.

124.   On February 23, 2017, sensing that he had been scammed into pouring endless efforts into a startup company based on empty promises, Iannotti submitted written notice to Grossman that he was resigning as CTO and from his position on the Board of Directors of PriceMDs.   This letter also reflected Iannotti's intent to retain the 12,500 shares stock he had purchased in the PriceMDs' Friends & Family stock round.

125.   Grossman acknowledged receipt of Iannotti's demand without challenging Iannotti's stock ownership in the course of multiple email exchanges between these individuals.

126.   Iannotti acted in reliance on his agreement with Grossman, acting on behalf of PriceMDs, and provided the agreed upon services and equipment, but PriceMDs refused to issue the promised stock certificates.

127.   PriceMDs also committed multiple and ongoing breaches of the Iannotti SPA, which provides that he would be paid "quarterly pro rata from 40% of collected revenue" until his original stock purchase amount was repaid in full, *see* Nos. 3, 9, and 10, Exhibit C.

128.   On December 17, 2015, Grossman sent an e-mail to all PriceMDs shareholders advising that the company would be making its "first 'return of *capital* payment' on April 15, 2016."  In fact, Iannotti has not received a single return of capital payment to date.

129.   PriceMDs failure to timely pay and account for its payments (or lack thereof) is a direct breach of the company's contractual obligation to Iannotti to repay his capital investments "quarterly pro rata from 40% of collected revenue" until repaid in full.  *See* Nos. 3, 9, and 10, Exhibit C.

130.   Furthermore, PriceMDs has breached the Iannotti SPA by failing to include him in dividend payments made to all shareholders, and by failing to issue promised stock certificates despite repeated assurances by Panella that same would be issued.

131.   The Iannotti SPA contains an attorney's fee provision relating to enforcement of the agreement.

WHEREFORE, Iannotti demands judgment against PriceMDs for damages, attorneys' fees under the Iannotti SPA, court costs, and any such other and further relief as this Court deems just and appropriate.

### COUNT III
### Unjust Enrichment
### (Iannotti v. PriceMDs)

132.   Iannotti incorporates and re-allege paragraphs 1 through 98 as if fully set forth herein.

133.    This claim is plead in the alternative to Iannotti's breach of contract claim against PriceMDs for breach of the Iannotti SPA.

134.    As a result of the conduct described in the paragraphs comprising Count II herein, PriceMDs received goods and services purchased by Iannotti in reliance on PriceMDs' issuance of 12,500 shares of company stock.

135.    As a consequence of the acts set forth above, PriceMDs was unjustly enriched by receiving said goods and services provided by Iannotti.

136.    In equity and good conscience, PriceMDs should not be permitted to retain the goods or services without just compensation.

WHEREFORE, Iannotti demands judgment against PriceMDs for damages, court costs, and any such other and further relief as this Court deems just and appropriate.

### COUNT IV
### Unjust Enrichment
### (Holland and Iannotti v. PriceMDs)

137.    Holland and Iannotti incorporate and re-allege paragraphs 1 through 98 as if fully set forth herein.

138.    This claim is pled in the alternative to Holland's claims for breach of contract against PriceMDs as it relates to the payments required to be paid by PriceMDs to Holland by the Holland SPA_1, and in the alternative to Iannotti's claim for breach of contract against PriceMDs as it relates to the payments required to be paid by PriceMDs to Iannotti by the Iannotti SPA.

139.    Holland and Iannotti invested $35,000 and $25,000 under the Holland SPA_1 and the Iannotti SPA, respectively, and have seen absolutely no return on their investments.

140.    While Holland has received certain return of capital payments, they have been sporadic and wholly inconsistent with amounts received by other investors.

141.    Neither Holland nor Iannotti have had a single dollar of their investments returned as set forth in the Holland SPA_1 and the Iannotti SPA, respectively.

142.    Additionally, Iannotti was not included in the four (known) dividend payments made to shareholders to date.

143.    In a letter sent to all PriceMDs shareholders on or about February 20, 2019, Grossman proudly announced that "PriceMDs' last raise in common stock was completed at $3.50 per share, which is equivalent to a $51 MM post-money valuation on a fully diluted basis." Grossman also projected revenues for 2019 of "between $14 - $20+ million."

144.    To that end, PriceMDs has issued four (known) dividend payments to shareholders, in spite of the fact that not all shareholders have had their capital repaid in full, including Holland and Iannotti. These dividends, in even the smallest amounts, so greatly inure to the personal benefit of Grossman and Panella, while providing only a nominal benefit to the rest of the shareholders.

145.    PriceMDs' failure to repay Holland and Iannotti's capital investments "quarterly pro rata from 40% of collected revenue" has unjustly enriched PriceMDs.

146.    Moreover, PriceMDs' failure to pay Iannotti the dividend payments made to all shareholders, has also unjustly enriched PriceMDs.

147.    As a consequence of these acts, PriceMDs was unjustly enriched at the expense of both Holland and Iannotti, in that it wrongfully retained the monies otherwise due and owing to Holland and Iannotti.

148.    In equity and good conscience, PriceMDs should not be permitted to retain the monies wrongfully withheld that are otherwise due and owing to Holland and Iannotti.

WHEREFORE, Holland and Iannotti demand judgment against PriceMDs for damages, court costs, and any such other and further relief as this Court deems just and appropriate.

**COUNT V**
**Accounting**
**(Holland and Iannotti v. PriceMDs)**

149.    Holland and Iannotti incorporate and re-allege paragraphs 1 through 98 as if fully set forth herein.

150.    Although requested by Holland and Iannotti, PriceMDs has failed and refused, and continues to refuse, to account to either or both Holland and/or Iannotti for all monies paid by PriceMDs to Holland and Iannotti and the other shareholders of PriceMDs.

151.    Holland and Iannotti are entitled to an accounting from PriceMDs based upon PriceMDs failure to pay or to account to them for its failure to timely pay the amounts due under their respective Stock Purchase Agreements.

152.    An accounting is required because one or both of Iannotti and Hollands' remedies at law are inadequate.

WHEREFORE, Holland and Iannotti respectfully request that this Court enter and order declaring their entitlement to an accounting of PriceMDs' finances—specifically its payments to all shareholders since inception—and grant such further relief for Holland and Iannotti as this Court deem just and appropriate.

**COUNT VI**
**Fraud in the Inducement**
**(Iannotti v. Grossman, Panella, and PriceMDs)**

153.     Iannotti incorporates and re-alleges paragraphs 1 through 98 as if fully set forth herein.

154.     Grossman knowingly and intentionally made false representations to Iannotti in an effort to have Iannotti (and through Iannotti, Belmont) provide services and equipment for the benefit of PriceMDs.

155.     Grossman, on behalf of PriceMDs, repeatedly informed Iannotti that he would be issued 12,500 shares of PriceMDs stock, valued at $25,000.00, in exchange for his provision of discounted programming services (through Belmont), graphic design services, and for his purchase of equipment for the use and benefit of PriceMDs.

156.     Grossman made these representations to Iannotti, *inter alia*, in an email dated November 18, 2015.

157.     Based upon this modification of the Iannotti SPA, Iannotti continued to provide the agreed upon services and to purchase equipment to outfit PriceMDs' new corporate office, and Belmont continued to provide the agreed upon programming services, a portion of which satisfied Iannotti's obligations under the Iannotti SPA.

158.     Iannotti did not know that at the time he signed the Iannotti SPA, or later at the time he agreed with Grossman to modify the manner of consideration in that agreement, that Grossman, acting on behalf of PriceMDs, had no intent to deliver the stock certificates to Iannotti as promised; instead, Grossman and PriceMDs only entered into (and later agreed to

modify) the Iannotti SPA to obtain the benefit of Iannotti and Belmont's services and the equipment without providing anything in return.

159.    Upon information and belief, Panella was aware of Grossman's plan to defraud Iannotti and, in fact, assisted him in doing so.

160.    On repeated occasions, Iannotti demanded that PriceMDs issue the stock certificates reflecting his 12,500 shares paid for through the provision of services and the purchase of office equipment as agreed upon between Grossman, on behalf of PriceMDs, and Iannotti.

161.    Iannotti was forced to deal only with Panella on these issues in what can only be perceived as an attempt by Grossman to insulate himself from the fraud he perpetrated upon Iannotti, and Panella's knowing assistance therewith.

162.    Time and time again, Iannotti was promised by Panella that the certificates would be forthcoming.

163.    The stock certificates were never issued, as the Defendants obviously never had any intention of allowing Iannotti to become a shareholder of PriceMDs in their eyes.

164.    On February 23, 2017, sensing that he had been scammed into pouring endless efforts into a startup company based on empty promises, Iannotti submitted written notice to Grossman that he was resigning as CTO and from his position on the Board of Directors of PriceMDs.   This letter also reflected Iannotti's intent to retain the 12,500 shares stock he had purchased in the PriceMDs' Friends & Family stock round.

165.    Grossman, Panella, and PriceMDs knew the representations that they made to Iannotti were false at the time they made them.

166. Grossman and Panella knew that neither they, nor PriceMDs, would perform on their promises to issue the stock, which promises ultimately formed the basis of the Iannotti SPA.

167. Grossman and Panella's representations on behalf of PriceMDs were designed to induce Iannotti to provide uncompensated services and to acquire furnishings for PriceMDs' benefit, and ultimately to induce Iannotti and to enter into the Iannotti SPA under false pretenses.

168. Iannotti acted in reasonable and justifiable reliance on Grossman, Panella, and PriceMDs' false representations to their detriment by providing uncompensated services to PriceMDs and ultimately entering into the Iannotti SPA.

169. Iannotti has suffered damages as a result of their justifiable reliance.

WHEREFORE, Iannotti demands judgment against Grossman, Panella, and PriceMDs for damages, including but not limited to punitive damages, court costs, and any such other and further relief as this Court deems just and appropriate.

<u>COUNT VII</u>
**Negligent Misrepresentation**
**(Iannotti v. Grossman, Panella, and PriceMDs)**

170. Iannotti incorporates and re-alleges paragraphs 1 through 98 as if fully set forth herein.

171. This claim is pled in the alternative to Iannotti's claim for fraud in the inducement against Grossman, Panella, and PriceMDs.

172.    At the time Grossman, Panella, and PriceMDs made the representations set forth herein, and more specifically Count VII for fraud in the inducement, they knew or should have known that the representations were false.

173.    Iannotti justifiably relied on the representations by Grossman, Panella, and PriceMDs as to the provision of services and equipment to PriceMDs, in exchange for 12,500 shares of PriceMDs' stock and the issuance of certain stock options.

174.    Iannotti has been damaged as a direct and proximate result of his reliance on Grossman, Panella, and PriceMDs' misrepresentations.

WHEREFORE, Iannotti demands judgment against Grossman, Panella, and PriceMDs for damages, including but not limited to punitive damages, court costs, and any such other and further relief as this Court deems just and appropriate.

### COUNT VIII
**Conspiracy to Commit Fraud**
**(Iannotti v. Grossman and Panella)**

175.    Iannotti incorporates and re-alleges paragraphs 1 through 98 as if fully set forth herein.

176.    Grossman and Panella conspired together in a scheme to defraud Iannotti.

177.    Grossman and Panella acted in concert and at the behest of one another to convince Iannotti to enter into the Iannotti SPA, to provide services to and acquire furnishings for, and to continue to raise monies on behalf of PriceMDs.

178.    In pursuit of the conspiracy, each of the Defendants promised to issue stock certificates in PriceMDs and to issue stock options for PriceMDs in exchange for Iannotti continuing to perform work for and on behalf of PriceMDs, to acquire furnishings, and to raise

money from his family and friends for investment in the PriceMDs Friends and Family stock offering.

179.    Grossman and Panella knew that they would not cause PriceMDs to perform its obligations under the Iannotti SPA, but conspired together and obtained Iannotti's agreement to same.

180.    Grossman and Panella knew that PriceMDs was not going to issue the stock certificates, nor pay the monies otherwise required under the terms of the Iannotti SPA to Iannotti.

181.    As a direct and proximate result of the civil conspiracy by Grossman and Panella, Iannotti has been damaged.

WHEREFORE, Iannotti demands judgment against Grossman and Panella for damages, including but not limited to punitive damages, court costs, and any such other and further relief as this Court deems just and appropriate.

### COUNT IX
**Violation of the Florida Securities and Investor Protection Act**
**(Holland and Iannotti v. PriceMDs)**

182.    Holland and Iannotti incorporate and re-allege paragraphs 1 through 98 as if fully set forth herein.

183.    PriceMDs offered and sold securities and/or investments to persons in Florida and throughout the United States.

184.    Iannotti tendered services and equipment to PriceMDs at the request and solicitation of Grossman, on behalf of PriceMDs, based upon promises of 12,500 shares of PriceMDs stock at $2.00 per share, for an investment worth $25,000.00.  In return for an

investment, Iannotti was promised a payment quarterly pro rata from 40% of collected revenue of PriceMDs until the amount paid in stock purchase of PriceMDs.com of 50,000 shares dated 9/1/15 was paid in full.

185.    Holland was brought in as an investor in PriceMDs during the Friends & Family round by former PriceMDs Director of Finance, Chris Eikenberry.  Holland made two separate investments during the Friends & Family round.  On or about August 10, 2015, Holland entered into a Stock Purchase Agreement with PriceMDs under which he purchased 17,500 shares of company common stock at a price of $2.00 per share, for an initial investment of $35,000.

186.    On or around January 8, 2016, Holland entered into a second Stock Purchase Agreement with PriceMDs pursuant to which he purchased an additional 50,000 shares of company common stock at the same price of $2.00 per share, for a second investment of $100,000.

187.    PriceMDs issued stock certificates to Holland for both of his purchases pursuant to the terms of the Holland SPAs.  Accordingly, Holland's total investment in PriceMDs was $135,000, and Holland currently holds 67,500 shares of company common stock.

188.    Both the Holland SPA_1 and Holland_SPA2 contain provisions for repayment of dollars invested.

189.    The Holland SPA_1 provides, in relevant part:

Jared Lynn Holland will be paid quarterly pro rata from 40% of collected revenue* until amount paid in stock purchase of PriceMDs.com of 17,500 shares dated 8/10/15 is paid in full to Investor.  *Revenue is monies paid solely and exclusively from sales of 'Click Throughs' on website PriceMDs.com.

Holland SPA_1, Exhibit A.

190.    Whereas, the Holland SPA_2 states:

Jared Lynn Holland will be paid quarterly pro rata from 40% of collected revenue* until amount paid in stock purchase of PriceMDs.com of 50,000 shares dated 1/8/16 is paid in full to Investor.  *Revenue is monies paid exclusively from sales of products and services as well as strategic partnerships of PriceMDs.com.

Holland SPA_2, Exhibit A.

191.    Both agreements provide that: "Investor retains all shares purchased with this Agreement."  *See* Exhibit A, § 1.5; *see* Exhibit B, § 1.5.

192.    In the nearly three (3) years that followed his initial investment, Holland did not receive a single dollar of capital repayment under either of the Holland SPAs.  Moreover, Holland was not provided any accounting of the revenues collected and/or repaid to investors.  Holland has never been provided an accounting or any type of explanation from PriceMDs of the revenues it has collected and/or repaid to investors.

193.    In May 2018, without any accounting or explanation, PriceMDs made an initial return of capital payment to Holland in the amount of $3,199.49.

194.    Since making his $135,000 investment in 2015, Holland has received return of capital payments from PriceMDs, as follows:

$  3,199.49 –    05/2018
$  3,274.49 –    09/2018
$  8,401.48 – 10/16/2018
$12,290.10 – 01/18/2019
$10,547.33 – 04/16/2019
$11,602.06 – 07/10/2019
$13,333.33 – 10/01/2019
$13,953.49 –    01/2020
$10,000.00 – 04/07/2020
$13,398.23 – 06/26/2020

195.    Holland also received a $0.01 per share dividend payment in January 2020 in the amount of $675, a $0.02 per share dividend payment in April 2020 in the amount of $1,350.00, a $0.021 per share dividend payment in July 2020 in the amount of $1,417.50, and a $0.025 per share dividend payment in September 2020 in the amount of $1,687.50.

196.    These dividends resulted in nominal payments to Holland, however, upon information and belief, produced significant payments to the company's top shareholders, including Grossman and Panella.

197.    More specifically, Holland has never been provided any information as to how the return of capital payments he has received have been calculated and whether they actually corresponded to PriceMDs contractual obligation to pay him "quarterly pro rata from 40% of collected revenue."

198.    Holland has never been provided an explanation of why it took nearly three (3) years to receive his first return of capital payment.

199.    PriceMDs has selectively paid return of capital payments to specific investors at its own discretion, rather than first paying Holland "quarterly pro rata from 40% of collected revenue" as the Holland SPAs require.

200.    Furthermore, PriceMDs is paying significant dividends to its largest shareholders prior to fulfilling its return of capital obligation to Holland.

201.    The Iannotti SPA and Holland SPAs are securities pursuant to Florida Statutes §517.021(21) because they are evidence of indebtedness and/or investment contract.

202.    Iannotti provided the services and equipment to PriceMDs, as promised, but PriceMDs retained the funds otherwise due and owing to Iannotti, diverting these funds for

their own benefit and the benefit of other shareholders in advance of Iannotti.  Similarly, Holland provided funds of $135,000, and currently holds 67,500 shares of company common stock.

203.    Both Iannotti and Holland are authorized to bring this action pursuant to Florida Statutes §517.191(5) because they have reason to believe that PriceMDs is engaged or are engaged in acts or practices constituting a violation of the Florida Securities Investor Protection Act.

204.    Section 517.301(1)(a) declares it is unlawful for any person to "employ any device, scheme, or artifice to defraud" in connection with the offer or sale of "any investment or security."

205.    PriceMDs, by and through its agents, employed a device, scheme, or artifice to defraud Iannotti and Holland by causing them to invest in PriceMDs, whether through the provision of services and equipment or via the investment of $135,000.00, by promising falsely that Iannotti and Holland would be paid quarterly pro rata from 40% of collected revenue of PriceMDs until the amount paid in stock purchase of PriceMDs.com of 50,000 shares dated 9/1/15 was paid in full.

206.    Further, Section 517.301(1)(c), Florida Statutes, declares that it is unlawful for a person to "knowingly and willfully falsify, conceal, or cover up, by any trick, scheme, or device, a material fact, make any false, fictitious, or fraudulent statement or representation, or make or use any false writing or document, knowing the same to contain any false, fictitious, or fraudulent statement or entry."

207.    New contract partners were touted regularly without any evidence of signed contracts or actual business dealings.  Investors were repeatedly told of the growing database of TPAs and physicians who had registered to use PriceMDs, though in reality, the database contents were simply scrubbed from the internet without the providers' knowledge or any agreement to work with PriceMDs.

208.    Simply put, PriceMDs' leadership was selling a concept as though it was already a reality, causing investors like Holland and Iannotti to make investments they otherwise would not have made had true and accurate representations of the company's status been known or disclosed

209.    PriceMDs violated Section 517.301(1)(c) by falsely stating to Iannotti and Holland that they would receive the pro rata share of revenues based on their investments and acquisition of PriceMDs common stock.

WHEREFORE, Holland and Iannotti demand judgment against PriceMDs for damages, enter temporary and permanent injunctions enjoining current and future violations of Chapter 517, freezing PriceMDs' bank accounts, appointing a receiver, entering other injunctive relief, ordering restitution, assessing civil penalties against PriceMDs, awarding attorneys' fees and court costs to Holland and Iannotti, and any such other and further relief as this Court deems just and appropriate.

## COUNT X
**Breach of Implied Covenant of Good Faith and Fair Dealing**
**(Holland and Iannotti v. PriceMDs)**

210.    Holland and Iannotti incorporate and re-allege paragraphs 1 through 98 as if fully set forth herein.

211.     The Holland SPA_1 and Iannotti SPA are valid contracts between Holland and Iannotti and PriceMDs on the other side.

212.     Florida law implies a covenant of good faith and fair dealing in every contract.

213.     Pursuant to the Holland SPA_1 and Iannotti SPA, both Holland and Iannotti were to receive certain payments from the revenue of PriceMDs.

214.     Iannotti and Holland's reasonable expectation was that PriceMDs would act in good faith and not, among other things, engage in self-dealing, pay other investors before paying them, and fail to issue the requisite payments under the contract.

215.     The above-described actions constitute breaches of the implied covenant of good faith and fair dealing.

216.     As a result of these breaches, Holland and Iannotti have been damaged.

WHEREFORE, Holland and Iannotti demand judgment against PriceMDs for damages, court costs, and any such other and further relief as this Court deems just and appropriate.

## COUNT XI
### Florida Deceptive and Unfair Trade Practices Act (FDUTPA) Claim
### (Holland and Iannotti v. PriceMDs)

217.     Holland and Iannotti incorporate and re-allege paragraphs 1 through 98 as if fully set forth herein.

218.     FDUTPA declares that: "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." *See* § 501.204(1), Florida Statutes.

219.    As discussed herein, PriceMDs caused to be delivered to Holland and Iannotti false information relating to the status, operations, and successes of PriceMDs, which constitutes a deceptive or unfair practice.

220.    As a result of the foregoing deceptive or unfair practices, Holland and Iannotti have suffered actual damages.

WHEREFORE, Holland and Iannotti demand judgment against PriceMDs for damages, court costs, interest, attorneys' fees under Section 501.2015, Florida Statutes, and any such other and further relief as this Court deems just and appropriate.

<u>**DEMAND FOR JURY TRIAL**</u>

Holland and Iannotti hereby demand a trial by jury on all issues so triable.

<u>**NOTICE OF INTENT TO SEEK ATTORNEYS' FEES**</u>

Holland and Iannotti hereby serve notice on Defendants of their intent to seek an award of attorneys' fees pursuant to the contracts sued upon and statutes enumerated, in the event that they prevail in this matter.

**[Signature follows]**

Dated: October 8, 2020.

Respectfully submitted,

/s/Christopher L. DeCort
CHRISTOPHER L. DECORT, FBN 89009, Trial Counsel
cdecort@jclaw.com
NICOLE DEESE NEWLON, FBN 832391
nnewlon@jclaw.com
**JOHNSON, CASSIDY,**
**NEWLON & DECORT, P.A.**
2802 N. Howard Avenue
Tampa, Florida 33607
Telephone: (813) 699-4859
Facsimile:  (813) 235-0462
Secondary: swalker@jclaw.com
*Attorneys for Plaintiffs*